IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 29, 2019, at Knoxville

## STATE OF TENNESSEE v. MICHAEL WAYNE ROBINSON, JR.

**Appeal from the Circuit Court for Madison County**
**No. 18-90     Roy B. Morgan, Jr., Judge**

_____

**No. W2019-00216-CCA-R3-CD**

_____

A Madison County jury convicted the defendant, Michael Wayne Robinson, Jr., of three counts of aggravated assault, one count of reckless endangerment with a deadly weapon, and one count of unlawful possession of a firearm by a convicted felon. Following a sentencing hearing, the trial court imposed an effective sentence of eighteen years in confinement. On appeal, the defendant challenges the sufficiency of the evidence to support his convictions and the trial court's imposition of consecutive sentencing. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and D. KELLY THOMAS, JR., J., joined.

George Morton Googe, District Public Defender; Jeremy B. Epperson, Assistant Public Defender, for the appellant, Michael Wayne Robinson, Jr..

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Bradley Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On the evening of August 30, 2017, Jameka Jackson was speaking with her father, Melvin Owens, outside his home on Dupree Street. Ms. Jackson was sitting inside her car while Mr. Owens stood just outside her window. Also in the vehicle were Ms.

Jackson's three children and Cameron Riley, Ms. Jackson's fifteen-year-old nephew. Several other people, including Sedarian Douglas, were in the yard outside Mr. Owens' residence.

While Ms. Jackson was speaking with Mr. Owens, a red Altima parked on the street several car lengths behind her. The defendant and Jerry Hennings exited the vehicle, and the defendant, who was holding a handgun and "talking crazy" "like he was on some type of drugs," began fighting with Mr. Douglas. Mr. Owens told the two men to quit fighting and "disrespecting [his] house." A few seconds later, someone said "he [has] a gun," and the defendant began firing. When the shooting started, Ms. Jackson, Mr. Riley, and Mr. Owens ran toward the house. Because Mr. Owens dropped Ms. Jackson's six-month-old daughter on the ground as he tried to get to safety, he was forced to hide behind his truck during the shooting, and, as he hid, his truck windows were "shot out."

Once inside her father's house, Ms. Jackson called 911 and described the shooter as black male with braids wearing a white shirt. After the defendant stopped shooting, he threated to "come back on Dupree and shoot and kill [everyone that was there]." The defendant and Mr. Hennings then returned to the red Altima and drove toward Lincoln Circle.

Officer Daniel Scott Melson with the Jackson City Police Department was working a call when he heard gunshots. As he followed the sound of the gunshots, dispatch directed Officer Melson to Mr. Owens' residence. Once at the scene of the shooting, Officer Melson spoke with Ms. Jackson, Mr. Riley, and Mr. Owens. He also collected four .45 caliber shell casings found "in the middle of the street." The shell casings consisted of two different brands, RNP and PMC.

Officer Princeton Hardin was working an assault case on Lincoln Circle when he received information about a shots fired call, including a description of two black males driving a maroon car with rear-end damage. A short time later, a vehicle matching this description passed Officer Hardin on Lincoln Circle, and two men matching the description of the suspects walked from the direction of the red Altima at "a fast pace" and entered the residence at 221B Lincoln Circle.

Officer Hardin called for backup. Once his backup arrived, Officer Hardin knocked on the door of the residence. Officers could hear voices inside, and, after several minutes, Lakesha Demoss opened the door to speak with Officer Hardin. Meanwhile, Officer Barton Braly was watching the back door of the residence when the defendant, who was wearing a white shirt, opened the door, saw Officer Braly, and went back inside. Officer Braly informed the other officers that someone tried to exit the

residence from the back door. A few seconds later, Mr. Hennings walked out of the front door and was detained. Because Officer Braly believed both individuals had gone into the front yard, he walked to the front of the house. However, when he noticed Mr. Hennings was wearing a black shirt, Officer Braly returned to the back door. As he did, Officer Braly saw the defendant running "in a sneaky fashion" toward Labelle Street. The defendant refused Officer's Braly's commands to stop, and several officers gave chase. After a brief foot chase, officers were able to cut off the defendant's route, and he was ultimately detained.

Following the detention of Mr. Hennings and the defendant, Ms. Demoss gave officers written consent to search her residence. Officer Zachary Brown located a .45 caliber Hi-Point semi-automatic pistol in an upstairs bedroom. The pistol had an extended magazine containing two rounds, and another round was "halfway lodged into the chamber." The brands of ammunition found in the pistol were RNP and PMC.

Shortly after the shooting, Ms. Jackson's sister provided her with a picture of the defendant.[1] The following day, Ms. Jackson provided Sergeant Nick Donald the picture of the defendant. She then identified the defendant as the shooter from a separate photo array prepared by Sergeant Donald. Additionally, Sergeant Donald showed a six-person photo lineup to Mr. Riley and Mr. Owens. Mr. Riley identified the defendant as someone who "look[ed] like the guy who was shooting," and Mr. Owens identified Mr. Hennings as a person who was "present at the scene" but not the shooter. Mr. Douglas, on the other hand, refused to cooperate or provide police officers with a statement.

Sergeant Donald and Investigator Darrell Listenbee interviewed the defendant following his arrest. During the interview, the defendant initially denied being on Dupree Street at the time of the shooting. Although he later admitted to being at the scene, the defendant claimed Mr. Hennings was the person who was fighting with Mr. Douglas. The defendant also stated several people at the scene were shooting guns. When asked about the house on Lincoln Circle, the defendant denied being in the residence but later told Sergeant Donald he knew officers found a gun inside the home. Although the defendant requested Sergeant Donald perform ballistics testing on the gun, Sergeant Donald did not feel it was necessary.

At trial, the State called Jameka Jackson, Cameron Riley, Melvin Owens, Officer Daniel Scott Melson, Officer Princeton Hardin, Investigator Darrell Listenbee, Officer Zachary Brown, Officer Barton Braly, and Sergeant Nick Donald as witnesses, and all rendered testimony consistent with the foregoing. On cross-examination, Ms. Jackson

---

[1] It is unclear from the record exactly how and from where Ms. Jackson procured a picture of the defendant.

agreed she described the shooter as having braids during the 911 call. However, she testified that Mr. Hennings was the individual with braids. She also acknowledged the defendant did not have braids in the picture Sergeant Donald showed her. However, she stated she was panicked at the time of the 911 call and was focused on keeping her children safe. Additionally, Mr. Riley testified he could no longer recall what the shooter looked like, and Mr. Owens testified he did not see whether the defendant or Mr. Hennings was the shooter.

Sergeant Donald testified Ms. Jackson, Mr. Riley, and Mr. Owens were cooperative following the shooting. However, he agreed they were "not so cooperative" during their trial testimony. Sergeant Donald explained it is common for victims in this type of investigation to become less cooperative over time due to concerns of retaliation. In this case, the three victims specifically expressed their concern of retaliation to Sergeant Donald. Additionally, during the testimony of Ms. Jackson, Sergeant Donald observed the defendant "making faces" at Ms. Jackson, and the defendant "flipp[ed Sergeant Donald] off and mouth[ed] something to him."

The defendant called Lanonda Jernigan, who testified she was the director of Jackson Central Dispatch Police and Fire. After listening to the 911 call made by Ms. Jackson during the shooting, Ms. Jernigan agreed the suspect was described as a black male with dreads or braids. In addition, per a stipulation, a photograph of the defendant taken following his arrest was entered into evidence.

Following deliberations, the jury found the defendant guilty of all counts. The trial court imposed a sentence of eight years to be served at 35 percent for Count one, aggravated assault of Melvin Owens; eight years to be served at 35 percent for Count two, aggravated assault of Jameka Jackson; eight years to be served at 35 percent for Count three, aggravated assault of Cameron Riley; three years at 35 percent for Count four, reckless endangerment with a deadly weapon; and ten years at 30 percent for Count five, unlawful possession of a firearm by a convicted felon. Counts one through four were to be served concurrently with each other but consecutive to Count five, for an effective sentence of eighteen years.

The defendant filed a timely motion for new trial, arguing the evidence was insufficient to support the defendant's convictions and the trial court erred in sentencing the defendant. The trial court denied the motion, and this timely appeal followed.

*Analysis*

On appeal, the defendant argues the evidence at trial was insufficient to support his convictions. The defendant also argues the trial court erred in imposing consecutive

sentences. The State contends the evidence is sufficient to sustain the defendant's convictions, and the trial court properly sentenced the defendant. We agree with the State.

## I. Sufficiency

The defendant argues the evidence at trial is insufficient to support his convictions. Although the defendant does not dispute the offenses were committed, he argues the State failed to establish his identity as the perpetrator of the offenses. Specifically, the defendant points to the victims' inconsistent testimony regarding the identity of the shooter. The State contends the evidence was sufficient to support each of the defendant's convictions.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The burden is on the State to prove the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)).

As charged in this case, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by using or displaying a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii). A person commits reckless endangerment who "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and does so with a deadly weapon. Tenn. Code Ann. § 39-13-103(a), (b)(2). Unlawful possession of a firearm by a convicted felon occurs when any person who has previously been convicted of a felony involving the use of or attempted use of force, violence, or a deadly weapon subsequently unlawfully possesses a firearm. Tenn. Code Ann. § 39-17-1307(b)(1)(A). On appeal, the defendant concedes he was previously convicted of aggravated burglary as alleged in the indictment for this charge.

Here, the proof adduced at trial established that Ms. Jackson was sitting in her car outside her father's house and speaking with her father, Mr. Owens, when a red Altima parked some distance behind her. The defendant and Mr. Hennings exited the Altima, and the defendant began fighting with Mr. Douglas, who was in Mr. Owens' yard. Ms. Jackson saw a gun in the defendant's hand and stated he was "talking crazy." She then heard someone say that "he" had a gun, and gunfire immediately erupted. During the shooting, Mr. Owens and his six-month-old granddaughter were forced to take refuge behind his truck. Ms. Jackson, Mr. Riley, and Ms. Jackson's other children were able to run into Mr. Owens' house and call 911. During the 911 call, Ms. Jackson described the shooter as a black male with braids wearing a white shirt. Officer Hardin received information about a shots fired call containing a description of two black males driving a maroon car with rear-end damage, and, a short time later, a maroon Altima drove past him on Lincoln Circle. Two black males matching the description of the shooting suspects Officer Hardin received from dispatch walked from the direction of the Altima and entered a residence. Officer Hardin also noted that the Altima had damage to the rear as described in the report from dispatch. When officers approached the residence, the defendant fled and was apprehended following a brief foot chase. A .45 caliber Hi-point semi-automatic pistol was recovered from the residence, and the rounds remaining in the gun were the same two brands as the shell casings recovered from the scene. Although

the defendant denied he was the shooter, he admitted to being present at the scene of the shooting.

The following day, Ms. Jackson provided the police with a picture of the defendant and identified the defendant as the shooter from a separate photo array. Mr. Riley also identified the defendant from a photo array noting the defendant "look[ed] like the guy who was shooting." Additionally, Mr. Owens identified Mr. Hennings as person who was "present at the scene" but not the shooter.

At trial Ms. Jackson again identified the defendant as the shooter and identified the vehicle the defendant was in on the night of the shooting. While she told 911 that the shooter had braids, Ms. Jackson testified at trial the man with the defendant had braids, not the defendant. Despite his prior identification of the defendant, Mr. Riley testified at trial that he could no longer recall what the shooter looked like. He did, however, corroborate other's testimony concerning the description of the vehicle as red with damage to the rear. Mr. Owens was consistent with his prior statement and testified he did not see the shooter. He was, however, able to identify the defendant's vehicle.

From these facts, a rational trier of fact could have found the defendant guilty of aggravated assault, reckless endangerment with a deadly weapon, and unlawful use of a firearm by a convicted felon. Two eye-witnesses saw the defendant with a gun and identified the defendant as the shooter within days of the shooting. While the third eye-witness could not identify the defendant as the shooter, he did consistently testify that the man with the defendant, Mr. Hennings, was not the shooter. Moments after the shooting, the defendant was seen exiting a vehicle described by the eye-witnesses. The defendant was then caught trying to flee a residence in which a gun, loaded with the same two types of ammunition found at the scene, was discovered. Finally, the defendant, though denying he was the shooter, admitted to being at the scene of the shooting. Although the defendant argues the witnesses provided inconsistent descriptions of the shooter, specifically Ms. Jackson's initial description of the shooter as having braids, by its finding of guilty as to the defendant's charges, the jury resolved any inconsistencies in testimony in favor of the State. We will not second-guess the jury in the resolution of any conflicts in the proof. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). The defendant is not entitled to relief on this issue.

## II.    Sentencing

The defendant also argues the trial court abused its discretion in imposing consecutive terms. Specifically, the defendant argues the trial court failed to make the required findings to support its conclusion that the defendant was a professional criminal

and a dangerous offender.  The State contends the trial court properly imposed an effective sentence of eighteen years.  We agree with the State.

When determining the appropriate sentence, the trial court must consider these factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made on his own behalf about sentencing.  *See* Tenn. Code Ann. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).  The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant when determining the sentence alternative or length of a term to be imposed.  Tenn. Code Ann. § 40-35-103.

When the record establishes the sentence imposed by the trial court was within the appropriate range and reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  The trial court must state on the record the factors it considered and the reasons for the sentence imposed.  Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 706.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013), the Tennessee Supreme Court expanded its holding in *Bise* to also apply to decisions by trial courts regarding consecutive sentencing.  *Id.* at 859.  This Court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)."  *Id.* at 861.  "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences."  *Id*. at 862 (citing *State v. Dickson*, 413 S.W.3d 735 (Tenn. 2013)).

In imposing consecutive sentences, the trial court found the defendant "is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;" "is an offender whose record of criminal activity is extensive;" and "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is

high." Tenn. Code Ann. § 40-35-115(b)(1), (2), (4). At the sentencing hearing, the trial court articulated its reasons for imposing consecutive sentences, as follows:

> I have again reviewed what the State has set forth in their argument. I've heard argument today. I've heard [the] response of defense counsel. I do find that in this particular case, the [d]efendant is a professional criminal who has knowingly devoted a substantial part of his life to criminal conduct. He's an offender whose record is extensive. He's a dangerous offender whose behavior indicates little or no regard to human life and no hesitation about committing a crime with a high risk to human life, and specifically, the circumstances surrounding the commission of the offense are aggravated in this case. Because of the facts of this case and the aggregate length of the sentence reasonably relates to the offenses of which the [d]efendant stands convicted, I'm taking that into consideration making those specific findings which are necessary for consecutive sentencing. He's not on any type of probation or parole, so that would not apply in this case. But I think those are discretionary factors for the [c]ourt to consider that are appropriate as far as a finding specifically applying to this case. For that reason, consecutive sentencing will be appropriate.

In finding the defendant is a professional criminal, the defendant argues the trial court failed to make the required determination that the defendant's criminal acts were "a major source of livelihood," and the State agrees the required findings were not made in respect to this factor. Although the record reflects an extensive criminal history, there is no indication the defendant's criminal acts were a major source of his livelihood. Accordingly, this factor does not support consecutive sentencing.

With respect to factor (4), a "dangerous offender," the defendant argues the trial court failed to make the required findings pursuant to *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). Before imposing consecutive sentencing based upon the dangerous offender classification, the trial court must find "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *Id.* Here, although the trial court stated consecutive terms reasonably relate to the defendant's convictions, it failed to state the specific facts it found to satisfy its conclusion. *See State v. Scott M. Craig*, No. E2001-01528-CCA-R3-CD, 2002 WL 1972892, at *8 (Tenn. Crim. App. Aug. 27, 2002), *no perm. app. filed* ("A mere statement that confinement is necessary to protect society and that the severity of the sentence is reasonably related to the convicted offenses, without more, is insufficient to justify consecutive sentences."); *Wilkerson*, 905 S.W.3d at 938 (holding the trial court must make "*specific findings* regarding the severity of the offenses and the necessity to protect society before ordering consecutive

sentencing under Tenn. Code Ann. § 40-35-115(b)(4)") (emphasis added). Furthermore, the trial court failed to find consecutive sentencing is necessary to "protect the public from further serious criminal conduct by the defendant." Because the trial court failed to make the required findings regarding factor (4), this factor does not support consecutive sentencing. *Pollard*, 432 S.W.3d at 869 ("[W]hen trial courts fail to include the two additional findings before classifying a defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences.").

Although not challenged by the defendant, our review of the record supports the trial court's finding that the defendant is an offender whose record of criminal activity is extensive. The defendant's presentence report, which was entered as an exhibit at the sentencing hearing, lists thirty-four prior convictions beginning when the defendant was eighteen years old, including convictions for assault, retaliation, and evading arrest. As previously noted, the existence of only one factor is sufficient to impose consecutive sentencing. *See* Tenn. Code Ann. § 40-35-115(b); *Pollard*, 423 S.W.3d at 862 ("Any one of these grounds is a sufficient basis for the imposition of consecutive sentencing.") (citing *Dickson*, 413 S.W.3d at 748). Accordingly, the trial court did not abuse its discretion by imposing consecutive sentences, and the defendant is not entitled to relief on this issue.

### *Conclusion*

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE